IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KENT FARMS HOLDING, LLC,            )
a Virginia limited liability company, )
                                    )
    Plaintiff/Counterclaim Defendant, )
                                    )
v.                                  )   Civil Action No. 3:24-cv-191–HEH
                                    )
NVR, INC., a Virginia corporation,  )
D/B/A RYAN HOMES,                   )
                                    )
    Defendant/Counterclaim Plaintiff.  )

## MEMORANDUM OPINION
### (Denying Motions for Judgment on the Pleadings and Summary Judgment)

THIS MATTER is before the Court on Plaintiff/Counterclaim Defendant Kent Farms Holding, LLC's ("Kent Farms" or "Seller") Motion for Judgment on the Pleadings ("Motion for Judgment", ECF No. 11) and Defendant/Counterclaimant NVR, Inc.'s ("NVR" or "Purchaser") Motion for Partial Judgment on the Pleadings or, in the Alternative, Partial Summary Judgment ("Motion for Judgment on the Pleadings and Summary Judgment", ECF No. 13). The Court heard oral argument on October 1, 2024. The parties filed memoranda supporting their respective positions. For the following reasons, the Court will deny the motions.

### I. BACKGROUND

#### A. The Agreement

Kent Farms and NVR entered into an agreement over the purchase of residential building lots in New Kent County Virginia (the "Agreement," ECF No. 1-1) on

October 29, 2019.[1] In the Agreement, Kent Farms agreed to sell NVR over 480 acres of real property, subdivided into about 472 lots, to develop a planned, mixed-use community. (*Id.* ¶¶ 1–2, 14.) NVR was required to purchase individual lots or small groups of lots over time until all the lots were sold. (*Id.* ¶ 18.) Under Section 2 of the Agreement, Kent Farms was obligated to develop certain infrastructure on each lot prior to NVR's purchase, including grading each lot, installing water and sewer mains, and paving streets and sidewalks, among other things. (*Id.* ¶ 20.)

The Agreement treated some of the lots differently both by their price and by the timeline in which they would be sold. (*Id.* ¶ 21–34.) Subparagraph 2(h) of the Agreement described how each category of lot would be priced. For the first 195 lots, the Agreement set the initial price at $61,000 (the "Priced Lots"). (*Id.*; Agreement ¶ 2(h)(i).) Once 150 of the 195 Priced Lots had been purchased, the Agreement authorized the parties to negotiate the price of the subsequent batches of 100 lots (the "Market Rate Lots"). (Agreement ¶ 2(h)(ii).) If the parties could not agree on a price, Subparagraph 2(h)(ii) of the Agreement established a procedure for each party to hire an MAI-certified appraiser[2] to complete an appraisal within thirty (30) days after the beginning of the appraisal period. Specifically, Subparagraph 2(h)(ii) states in relevant part:

---

[1] The parties amended the Agreement on June 14, 2022, modifying Paragraph 19 which addressed amenity fees.

[2] "MAI" is a designation by the Appraisal Institute, a professional association of real estate appraisers. Appraisal Institute, *Appraisal Institute Professional Designations*, https://www.appraisalinstitute.org/about/our-designations (last visited Mar. 10, 2025). "MAI Designated Members agree to adhere to the Appraisal Institute Code of Professional Ethics and Standards of Professional Practice, underscoring a commitment to sound and ethical professional practice." *Id.*

2

> For a period of thirty (30) days after Purchaser purchases the one hundred fiftieth (150th) Priced Lot (the "**Negotiation Period**") the parties will negotiate the Purchase Price for the next one hundred (100) Market Rate Lots to be purchased by Purchaser under the Agreement. In the event the parties cannot agree on a Purchase Price for the Market Rate Lots during the Negotiation Period either party may provide notice to the other that the Negotiation Period has ended and that the next period (the "**Appraisal Period**") has commenced as of the date of the notice. Each of the parties shall then select an independent MAI-certified appraiser with experience in evaluating lot values in the area where the Lots are located. The selected MAI-certified appraisers will complete an independent valuation no later than thirty (30) days after the commencement of the Appraisal Period.

A party's failure to complete an appraisal within the appraisal period would result in the other party's valuation setting the price. (*Id.*) If both parties hired an MAI-certified appraiser, and if the valuations by the two parties varied by less than 5%, then the purchase price would be calculated as the average of the two valuations. (*Id.*) However, if the two valuations "vary by more than five percent (5%), the two MAI-certified appraisers will select a third independent MAI-certified appraiser no later than forty five (45) days after the commencement of the Appraisal Period." (*Id.*) Under that scenario, the purchase price would be the average of whichever two of the three valuations were closest. (*Id.*) Finally, "[i]n the event that either a MAI-certified third appraiser is not selected within the required timeframe or the third valuation is not completed within the required timeframe, the Purchase Price for the Market Rate Lots will be the average of the initial two valuations, regardless of the amount of the variation." (*Id.*)

Importantly, the Agreement then states in Subparagraph 2(h)(v), "The take-down schedule described in Subparagraph 2(a) hereof will apply to each set of Market Rate Lots priced in accordance with Subparagraph 2(h)(ii) above." In other words,

3

Subparagraph 2(a) governed the timing of Market Rate Lot purchases. (Agreement ¶ 2(a); Compl. ¶ 29.) That subparagraph provides:

> Purchaser agrees to purchase one (1) Lot (the "**Model Lot**") within forty five (45) days after receipt by Purchaser of written notice from Seller (the "**Model Lot Purchase Period**") that: (i) the plats have been recorded for the Model Lot; (ii) curb, gutter and stone have been completed on the Lots; (iii) at least thirty (30) days have passed since the County has delivered written notice of tentative accepted (sic) the water and sewer systems; and (iv) full access is available to Purchaser to the Model Lot. Purchaser then agrees to purchase an additional twenty nine (29) Lots within forty five (45) days after the expiration of the Model Lot Purchase Period (the "**Bulk Purchase**") and after Purchaser's receipt of written notice that the Conditions Precedent to Settlement have been met (a "**Completion Notice**") for thirty (30) Lots. Purchaser will then purchase a minimum of ten (10) Lots per Quarter (as hereinafter defined) thereafter, and continuing on a Quarterly basis until all of the Lots are sold. A "**Quarter**" consists of three (3) calendar months. The first (1st) Quarter shall commence seven (7) calendar months after the closing on the Bulk Purchase. Purchaser must use commercially reasonable efforts to obtain the building permit within thirty (30) days after Purchaser's receipt of the initial Completion Notice.
>
> Purchaser shall diligently pursue completion of the model homes to be constructed on the Model Lot and issuance of the use and occupancy permit therefor as soon as possible after the purchase of the Model Lot.

(Agreement ¶ 2(a) (emphasis in original).) At the outset, Subparagraph 2(a) required NVR to purchase a Model Lot within forty-five (45) days of notice that Kent Farms had completed certain infrastructure improvements. (*Id.*) After that, NVR was required to make a bulk purchase of twenty-nine (29) additional lots within another period of forty-five (45) days. (*Id.*) Next, NVR would purchase a minimum of ten (10) Lots per Quarter and continuing on a Quarterly basis.

Under Subparagraph 2(c), Kent Farms was required to "meet the Conditions Precedent to Settlement for no fewer than forty (40) Lots (the '**Available Lots**')." If Kent Farms did not meet this obligation (the "Available Lot offering"), Subparagraph

4

2(c) authorized NVR to "declare Seller to be in default of this Agreement" if Kent Farms failed to cure such default after NVR provided notice and the corresponding cure period expired. Similarly, Subparagraph 2(g) authorized Kent farms to declare NVR in default if NVR "fail[ed] to purchase the minimum number of Lots as required herein during any one Quarter" after Kent Farms provided NVR notice and 15 days to cure.

Paragraph 6 described conditions precedent to NVR's obligation to purchase the Lots. Subparagraph 6(a) clarified that a condition precedent related to amenities "shall not apply to the Model Lot." Subparagraph 6(j) also set a condition precedent:

> With respect to the Model Lot only, [Kent Farms shall confirm utilities will be] serving the Model Lot and the same shall be installed and immediately available for Purchaser to connect to within sixty (60) days of the applicable Model Lot settlement; all other utilities for the Model Lots provided for in this Agreement shall be installed and immediately available for Purchaser to connect to including, but not limited to, natural gas.

**B. The Parties' Conduct**

On October 23, 2023, NVR purchased its 150th Priced Lot, which triggered the process, under the Agreement, for negotiating and ultimately establishing the purchase price for the first batch of 100 Market Rate Lots. (Counterclaim ¶ 15, ECF No. 5; Agreement ¶ 2(h)(ii).) NVR submitted an appraisal report conducted by Integra Realty Resources on December 1, 2023, which valued the relevant Market Rate Lots at $75,000 each. (Compl. ¶¶ 42–43.) However, according to Kent Farms, this appraisal "was fundamentally flawed and did not comport with the requirements and standards for an MAI certified appraisal in violation of Section 2(h)(ii) of the Agreement." (*Id.* ¶ 43.) On December 21, 2023, Kent Farms notified NVR of the deficiencies in its appraisal and

5

submitted an appraisal report conducted by Barber & Associates on December 18, 2023, which valued the lots at $135,000 each. (*Id.* ¶ 44.) The Appraisal Period expired with NVR not having completed an appraisal that Kent Farms considered to be adequate. (*Id.* ¶ 47.) Because Kent Farms believed NVR had not conducted an acceptable appraisal, Kent Farms asserted that its own appraisal provided the only valid valuation of the Market Rate Lots, and therefore, its valuation of $135,000 per lot was the controlling price per the Agreement. (*Id.* ¶ 47.) NVR disagreed and refused to purchase the lots at this price. (*Id.* ¶ 48.)

In addition to the price dispute, the parties also disagreed on how quickly the Agreement required NVR to purchase the Market Rate Lots—that is, they fought over the meaning of the "take-down schedule described in Subparagraph 2(a)." (*See id.* ¶ 49.) NVR argued that the Agreement only requires a single purchase of a Model Lot and a single bulk purchase. (*Id.* ¶ 50.) After that, NVR contended, it was only required to purchase ten (10) lots per Quarter. (*Id.*) In contrast, Kent Farms argued that NVR must purchase a Model Lot and make a bulk purchase for each set of 100 Market Rate Lots. (*Id.* ¶¶ 51, 54.) The parties exchanged emails in an effort to resolve their disagreements on both price and the interpretation of the take-down provision. (*Id.* ¶¶ 50–65.) They failed to settle these disputes. (*Id.*)

On February 26, 2024, Kent Farms provided NVR with a Notice of Default. (*Id.* ¶¶ 61–65.) In response, NVR maintained that its interpretation of the Agreement was correct. (*Id.*) Because NVR did not cure the alleged defects within fifteen (15) days,

6

Kent Farms provided NVR with a Notice of Termination of the Agreement on March 13, 2024. (*Id.*)

That same day, March 13, Kent Farms filed its Complaint (ECF No. 1) in this Court. Kent Farms seeks a judgment declaring: (1) that Kent Farms' interpretation of the Agreement is correct; (2) that NVR is in default of its obligations under the Agreement; and (3) that Kent Farms validly terminated the Agreement and therefore has no further obligations to NVR. (*Id.* at 15–16.)

NVR filed its Counterclaim on April 29, 2024. NVR seeks a judgment declaring that NVR's interpretation of the take-down schedule is correct and therefore Kent Farms cannot hold NVR in default and terminate the Agreement. (Countercl. at 13–15.) In addition, NVR seeks a judgment for specific performance (2) requiring Kent Farms to sell NVR the remaining Priced Lots; (3) requiring Kent Farms to sell NVR ten (10) lots on a Quarterly basis in accordance with the price set by the independent appraiser process set forth in Section 2(h)(ii) of the Agreement; and (4) requiring Kent Farms to negotiate the price of the Market Rate Lots in sets of 100 and to have 40 lots available to sell at all times. (*Id.* at 15–20.)

The parties filed cross motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (ECF Nos. 11, 13.) In addition, NVR's Motion goes on to request Partial Summary Judgment as to Count III of its Counterclaim. (ECF No. 13.) For the reasons that follow, the Court will deny each of the motions.

## II. LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." When considering a Rule 12(c) motion for judgment on the pleadings, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Conner v. Cleveland Cnty., N. Carolina*, 22 F.4th 412, 420 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 523 (2022) (quoting *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019)). The Court may consider written instruments attached to the complaint or answer, as well as any documents that are integral to the complaint and authentic. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013). The Court must then determine if the case can be decided as a matter of law. *Liberty Mut. Fire Ins. Co. v. Sutton*, No. 21-1277, 2022 WL 11112589, at *6 (4th Cir. Oct. 19, 2022); *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000). In short, judgment should be entered for the moving party if, after viewing the facts in the nonmoving party's favor, the pleadings show that the moving party is entitled to judgment as a matter of law.

Under Virginia law, courts adhere to the "plain meaning" rule in interpreting and enforcing a contract. *Cap. Com. Properties, Inc. v. Vina Enterprises, Inc.*, 462 S.E.2d 74, 77 (Va. 1995) (quoting *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)). "'[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'" *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (alteration in original) (quoting

8

*Berry*, 300 S.E.2d at 796). When interpreting a contract, a court should read the contract as a single document and give meaning to every clause where possible. *Id.* (citing *Berry*, 300 S.E.2d at 796). A "contractual term, absent a definition in the contract, is construed according to its usual, ordinary, and popular meaning." *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77 (2008). In sum, a clear and unambiguous contract must be construed as written. *Kelly v. Ammado Internet Servs., Ltd.*, 2012 WL 4829341 at *3 (E.D. Va. Oct. 10, 2012) (quoting *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012)).

Where a contract is capable of more than one reasonable interpretation, it is ambiguous under Virginia law. *Pocahontas Min., LLC v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008) ("[An] ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time."). "If a particular [contractual] term is ambiguous . . . the meaning of that term presents an issue of fact that precludes dismissal on a motion for judgment on the pleadings." *Williams v. CDP, Inc.*, 474 F. App'x 316, 319 (4th Cir. 2012); *see Morrow v. Navy Fed. Credit Union*, 2022 WL 2526676, at *5 (4th Cir. July 7, 2022) (applying Virginia law and vacating a district court order that granted a motion to dismiss where the contract at issue was ambiguous and thus it was "necessary to resort to parol evidence").

The Federal Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," the district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought." 28 U.S.C. § 2201. A district court has "unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

Specific performance is a remedy that may be granted or refused under established equitable principles and the facts of a particular case. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1088 (E.D. Va. 2011) (citing *Cangiano v. LSH Building Co.*, 623 S.E.2d 889, 894 (Va. 2006)). "When a remedy at law is inadequate to compensate for non-performance, specific performance may be decreed." *Id.* (citing *Chattin v. Chattin*, 427 S.E.2d 347, 350 (Va. 1993)). Although specific performance may be available as a remedy, it is not a cause of action in its own right. *People, Tech., & Processes, LLC v. Bowhead Logistics Sols., LLC*, No. 1:17-cv-282, 2017 WL 2264476, at *4 (E.D. Va. May 23, 2017) (finding that "specific performance is merely a remedy, not a cause of action."). The Supreme Court of Virginia has further held that a court "will not specifically enforce a contract unless . . . [a]ll the essential terms of the contract [are] finally and definitely settled. None must be left to be determined by future negotiations." *Wilburn v. Mangano*, 851 S.E.2d 474, 476 (Va. 2020) (alterations in original) (quoting *Duke v. Tobin*, 96 S.E.2d 758 (Va. 1957)).

The Fourth Circuit has stated that "a court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Goodman v. Diggs*, 986 F.3d 493, 497–500 (4th Cir. 2021) (quoting *Brooks v. Johnson*, 924 F.3d 104, 111 (4th

Cir. 2019)); Fed. R. Civ. P. 56(a). In addition, summary judgment should only be granted "after adequate time for discovery." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Courts must take care to consider '*all* contradictory evidence'" which necessarily cautions against a premature grant of summary judgment. *Boyle v. Azzari*, 107 F.4th 298, 300–02 (4th Cir. 2024) (holding that the district court abused its discretion by granting summary judgment before discovery) (quoting *Knibbs v. Momphard*, 30 F.4th 200, 216 (4th Cir. 2022)).

### III. ANALYSIS

The issue at the heart of this case is the meaning of Subparagraph 2(h)(v) in the Agreement, which states: "The take-down schedule described in Subparagraph 2(a) hereof will apply to each set of Market Rate Lots priced in accordance with Subparagraph 2(h)(ii) above." The parties disagree over what constitutes the "take-down schedule." It is worth noting at the outset that the Agreement does not define the term. The Agreement does, however, provide the reader a clue as to what the term means by stating that it is "described in Subparagraph 2(a)." Subparagraph 2(a) describes NVR's obligation to purchase one (1) Model Lot, purchase an additional twenty-nine (29) Lots, and "then purchase a minimum of ten (10) Lots per Quarter (as hereinafter defined) thereafter, and continuing on a Quarterly basis until all of the Lots are sold." Whether the Agreement requires this series of three events to occur *once* or *multiple times* is disputed by the parties.

NVR contends that the "take-down schedule" refers only to the final step of the process outlined in Subparagraph 2(a)—that NVR must purchase at least ten (10) lots per

11

Quarter until all of the Lots are sold. (NVR's Mem. Opp'n to Mot. for J. at 6–8, ECF No. 15.) The phrase "until all of the Lots are sold" in the Agreement means, NVR argues, *all 277* of the Market Rate Lots. (*Id.*) Therefore, NVR contends, the Agreement's requirement for NVR to purchase the Model Lot and then make the Bulk Purchase of twenty-nine (29) lots is a one-time event. (*Id.*)

Reviewing the Agreement as a whole, the Court finds that NVR has the most reasonable interpretation of the contact. First, consistent with NVR's interpretation, Subparagraph 2(a) describes "one" singular purchase of "the Model Lot." Indeed, five (5) times in Subparagraph 2(a), and then again in Subparagraph 6(a), the Agreement refers to a single "Model Lot." Second, the only element of Subparagraph 2(a) that uses the phrase "and continuing" is NVR's obligation to purchase ten (10) Lots per Quarter. In contrast, NVR's purchase of the Model Lot and of twenty-nine (29) lots are not described as continuing events. Subparagraph 2(a) does not contain any term specifying that those two events occur more than once. Third, the Agreement defines the term "Lots" to mean all 472 lots, including the Priced Lots and the Market Rate Lots. (Agreement at 1.) In Subparagraph 2(a), the Agreement states that NVR must purchase a minimum of ten (10) lots per Quarter "until all of the *Lots* are sold." (Emphasis added.) Therefore, the plain meaning of Subparagraph 2(a) would appear to be that once NVR's obligation to purchase ten (10) lots per Quarter begins, that requirement continues until all the 472 Lots contemplated by the Agreement have been sold. Fourth, while the Agreement authorizes Kent Farms to hold NVR in default for failing to purchase at least

10 Lots per Quarter (*id.* ¶ 2(g)), there are no similar enforcement provisions for the purchase of the Model Lot or the Bulk Purchase of twenty-nine (29) lots.

While NVR contends that its interpretation of the Agreement is correct, NVR argues in the alternative that the meaning of "take-down schedule" is "at least ambiguous." (NVR's Mem. Opp'n to Mot. for J. at 7–8.) In its supplemental brief to this Court, NVR further explained, "The Agreement is not a model of clarity with respect to the 'take-down schedule' and the meaning of the phrase is, in short, unclear." (NVR's Suppl. Mem. at 3–4, ECF No. 28.) NVR points out that the Agreement does not define "take-down schedule" and the term is used only once in the Agreement. (NVR's Mem. Opp'n to Mot. for J. at 8–9.) Similarly, the surrounding language in the Agreement does not aid the reader in understanding the term other than to state that the "take-down schedule" is described in Subparagraph 2(a). Furthermore, the term "take-down schedule" does not have a meaning in common parlance and its meaning cannot be found in an ordinary dictionary. NVR explains that "'take-down schedule' is a term of art specific to this industry." (*Id.* at 9.) Therefore, NVR argues, "Parol evidence is needed to clarify the parties' intent." (*Id.*)

In contrast, Kent Farms contends that the plain language of the Agreement unambiguously favors Kent Farms' interpretation of "take-down schedule." (Kent Farms' Mem. Supp. Mot. for J. at 7–13, ECF No. 12.) First, Kent Farms explains that this must be correct because the Agreement states, "Purchaser shall diligently pursue completion of the model *homes* to be constructed on the Model Lot." (Agreement ¶ 2(a) (emphasis added).) Kent Farms' argument is unavailing, however, because no matter how many

13

model *homes* NVR plans (or planned) to build during the span of the development project, this portion of the Agreement still only describes one Model *Lot*. (*Id.*)

Second, Kent Farms argues that Subparagraph 2(a) of the Agreement appears to be a complete whole. (Kent Farms' Mem. Supp. Mot. for J. at 7–13.) The first sentence describes the starting event: "purchase [of] one (1) Lot (the 'Model Lot')." (Agreement ¶ 2(a).) Every subsequent event flows from this initial event with defined deadlines, forming a complete schedule that includes the Bulk Purchase and the Quarterly purchase of 10 Market Rate Lots until one set of 100 such lots is sold. Under this construction of the contract, when Subparagraph 2(h)(v) states that the "take-down schedule described in Subparagraph 2(a) hereof will apply to each set of Market Rate Lots," this "take-down schedule" must refer to a whole schedule—not just the short sentence in Subparagraph 2(a) which requires NVR to purchase ten (10) lots per Quarter.

While Kent Farms presents a viable interpretation of the Agreement, it falls well short of dispelling the plausibility of NVR's interpretation. The Court finds that the meaning of "take-down schedule" in the Agreement is ambiguous. "Take-down schedule" is not defined or clarified by the Agreement. The term does not have a commonly accepted meaning outside its use as an industry-specific term of art. The Court notes, as described above, that NVR has raised strong arguments favoring its interpretation of what the "take-down schedule" must mean. However, this interpretation would require the Court to conclude that when Subparagraph 2(h)(v) refers to "[t]he take-down schedule described in Subparagraph 2(a)," the Agreement is simply pointing to one sentence in the middle of a long paragraph that constructs a robust schedule of lot sales. Furthermore,

14

Subparagraph 6(j) refers to both "the Model *Lot*" (singular) and "the Model *Lots*" (plural), injecting more confusion as to whether a model lot purchase is part of the take-down schedule and therefore occurs more than once.

The United States Court of Appeals for the Fourth Circuit has previously held that if a particular contractual term is ambiguous, then the meaning of that term presents an issue of fact that precludes dismissal on a motion for judgment on the pleadings. *Williams*, 474 F. App'x at 319 (citing *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992)). In fact, the Fourth Circuit vacated a district court order on similar facts to those presented here, refusing to affirm the granting of a dispositive motion at the pleading stage because the contract at issue was capable of more than one reasonable meaning. *See Morrow*, 2022 WL 2526676, at *4–5 (finding that a phrase in a contract was ambiguous when that phrase was not defined in the contract, its plain meaning in the context of the contract was not clear, and the language from the contract did not further clarify its meaning).

Under these circumstances, the Court cannot conclude, at this stage in the case, that the meaning of the term "take-down-schedule" in the Agreement is unambiguous. Consequently, the Court is precluded from relying on that particular contract provision to enter judgment on the pleadings. *See Martin Marietta Corp.*, 991 F.2d at 97; *Williams*, 474 F. App'x at 319. In its briefing to this Court, Kent Farms relies on the contention that the "take-down schedule" is unambiguous and that it should be read in Kent Farms' favor. (Kent Farms' Mem. Supp. Mot. for J. at 7–13; Kent Farms' Suppl. Mem., ECF No. 27.) Given that the Court finds otherwise—because the term is ambiguous—the

15

Court will deny Kent Farms' Motion. Likewise, the Court will deny NVR's Motion as to Counterclaim Count I, Count III, and the price negotiation portion of Count IV as they also rely on the meaning of the "take-down schedule" being unambiguous. (Countercl. at 13–20.) For example, Count III demands a judgment specifically enforcing NVR's interpretation of the "take-down schedule"—that Kent Farms sell the Market Rate Lots on a Quarterly basis. (*Id.* ¶ 64 ("Seller is obligated to sell all of the Market Rate Lots to NVR pursuant to the takedown schedule as interpreted by NVR.").) In addition, NVR's request for summary judgment is premature and depends on facts that, as Kent Farms argues, have been placed into genuine dispute. *See Goodman*, 986 F.3d at 497–500 (holding that summary judgment was premature prior to close of discovery); *Boyle*, 107 F.4th at 300–02 (4th Cir. 2024) (holding that the district court abused its discretion by granting summary judgment before discovery).

The Court further finds that the remainder of NVR's Motion cannot stand. Count II of the Counterclaim requested specific performance as to the sale of "all remaining 27 Priced Lots" to NVR. (Countercl. ¶¶ 59–62.) At the hearing on October 1, 2024, counsel represented that all the Priced Lots had been sold. (Tr. at 7:15–21, 8:14–25, 41:5–15.) Therefore, the Court finds that the parties' request for judgment on the pleadings on Count II of the Counterclaim would be moot.

Count IV of NVR's Counterclaim alleges three "other defaults" by Kent Farms. (Countercl. ¶¶ 68–73.) As previously discussed, one of those alleged breaches is dependent on the meaning of the "take-down schedule" and thus cannot be resolved at this stage in the case. (*Id.*) Two other breaches NVR alleges are that Kent Farms "fail[ed] to

16

have 40 Available Lots at all times after the initial Completion Notice," and that Kent Farms "anticipatorily breached the Agreement by marketing Lots contractually promised to NVR to other builders." (*Id.* at ¶¶ 70–71.) Of these two alleged breaches, only the former is enumerated in the Agreement as an event that can trigger default. (*See* Agreement ¶2(c) ("Should Seller not meet the Available Lot offering, Purchaser may (i) declare Seller to be in default of this Agreement . . . .").) Even so, there are several obstacles preventing NVR's Motion from being granted based on that claim.

First, Kent Farms' obligation to provide 40 Available Lots is predicated on the "initial Completion Notice" being issued, but the Counterclaim does not allege facts that clearly show when or if that notice occurred. Second, the impetus for the "initial Completion Notice" is tied-up with the timing of the "take-down schedule"—the exact issue at the heart of this case and the one that caused Kent Farms to attempt to terminate the Agreement. Third, the remedy the Agreement grants for default by Kent Farms is that NVR "shall be entitled, as its sole remedy for such default, either" (1) specific performance or (2) termination of the Agreement. (Agreement ¶ 9(b).) Under Count IV, NVR seeks specific performance, not termination. (Countercl. ¶¶ 68–73.) However, NVR is not entitled to specific performance because the price of the Market Rate Lots has not been settled but is instead one of the hotly-contested issues presented in this case. *See supra* Part I.B; *Wilburn v. Mangano*, 851 S.E.2d 474, 476–77 (Va. 2020) ("The essential term of price must have been agreed upon before a court will grant an action for specific performance.").

Finally, even assuming that these deficiencies were not present, the genuine disputes of fact raised by the parties constrain the Court from granting NVR the relief it seeks. *See supra* Part I.B; *Goodman*, 986 F.3d at 497–500; *Boyle*, 107 F.4th at 300–02. For all these reasons, the Court cannot grant either Kent Farms' Motion for Judgment or NVR's Motion for Judgment on the Pleadings and Summary Judgment.

## IV. CONCLUSION

For the aforementioned reasons, the Court will deny Kent Farms' Motion for Judgment on the Pleadings (ECF No. 11) and will also deny NVR's Motion for Partial Judgment on the Pleadings or, in the Alternative, Partial Summary Judgment (ECF No. 13).

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: March 12, 2025
Richmond, Virginia